We will hear argument first this morning in Case 23-1187, the Food and Drug Administration v. R.J. Reynolds Vapor Co. Mr. Suri? Mr. Chief Justice, and may it please the Court, the Court of Appeals has effectively nullified the Tobacco Control Act's restrictions on venue. Under the Act, an adversely affected person may challenge the denial of an application only in its home circuit or the D.C. circuit. But under the decision below, an applicant may challenge a denial in any circuit, anywhere in the country, so long as it can enlist a local retailer willing to join its petition. That decision is wrong in two different ways. First, the only person entitled to challenge the denial of an application is the applicant itself, not the applicant's retailers. Retailers are bystanders to the application process. They don't submit information to the agency, don't participate in the agency's review process, don't receive the order issued by the agency at the end of that process, and don't even get to see the full contents of the application or administrative record. Their interests lie outside the zone that Congress sought to protect. Second, even if the retailers could sue, applicants don't get to ride in on their coattails. Venue must be established separately for each party, and an applicant, the manufacturers here, may not lay venue based on the retailer's residence. The judgment of the Fifth Circuit should be reversed. So if your argument is that only applicants are covered, what do you do with the language any person adversely affected? The language any person adversely affected requires the court to infer the class of appropriate plaintiffs from the structure of the statute. And the language was used by Congress with respect to two classes of actions, regulations and denials. With respect to regulations, the class of adversely affected persons won't refer to applicants because there's no application process there. But with respect to denials, the only person properly regarded as adversely affected is the applicant itself. And the main reason for that is the structure of the statute. It is implausible that Congress set up a system in which someone, the retailers, would have a right to challenge an agency order, but wouldn't have a right to be notified of the order in the first place. It's simply unlikely that Congress would have expected such a person to be able to within 30 days after it's issued, they don't even know that it's been issued in the first place. Well, I think they probably do in terms of what they're following. I think it's a bit much to call them bystanders. I mean, their business depends upon this or in other circumstances, whatever the retailers are. And the whole purpose of the proceeding is to either overturn a decision preventing retailers from doing what retailers do with respect to the particular product. I mean, if that's the whole point of it, from the government's point of view, the regulatory point of view, and what's harmful to the public, it's whether or not these products are going to be sold. I don't know why the retailers aren't the most likely people to bring an action, a challenge to this. The most likely people to bring an action are the applicants themselves. We are not aware of a single case where a retailer has brought a freestanding challenge unaccompanied by the applicant. That's because it's simply practically implausible that the retailer would be able to do so. Again, the retailer isn't notified that the order has been issued and doesn't get to see the contents of the application. So as a practical matter, what's going on is that the retailer is simply a prop being used by the manufacturer to enable them to get into the circuit they prefer. They're not adding any value to the case itself. What you suggested, Mr. Suri, about the structure of the statute, I mean, I would think that this structure says, it points in the exact opposite direction from what you said. You know, it says A is the promulgation of a rule and B is the denial of an application. And as to both of those, any person adversely affected can file a petition. And you're essentially reading this so that the any person adversely affected has two different meanings, two different definitions for the A and the B. And I would think that that's a very strange way to think about this section. I respectfully disagree with the premise of that question, Justice Kagan. We are reading adversely affected to have the same meaning for A and B. It means the zone of interest test. It means you must infer from the structure of the statute the appropriate class of plaintiffs. It's just that the interests protected by the provisions authorizing regulations are different from the interests protected by the provisions authorizing denials of applications. Well, I guess I see the point. If you, you know, broaden out the generality, you can say, oh, it's still any person adversely affected. But as to A, it's one group of people. As to B, it's only the applicant. And, you know, I guess I just wouldn't understand a person writing this provision to have that in mind, to think that it can flip around as between A and B when the same language comes after it. On any reading of the statute, Justice Kagan, there are going to be different classes of people adversely affected under A than under B. A refers to regulations establishing and revoking tobacco product standards. So the adversely affected people could potentially include smoking cessation groups that believe that the tobacco manufacturers are being under-regulated. B, however, refers only to the denial of an application. It doesn't refer to the grant of an application. So it doesn't allow for under-regulation to be challenged. Does the retailer have Article III standing? Yes, we accept that the retailer has Article III standing. Why? The retailer is, in this case, being ultimately prevented by the Act from selling the products that the retailer wishes to sell. If the denial were reversed, then there is a chance that that injury would be redressed because... That sounds like adversely affected. That might sound like adversely affected in the colloquial sense of the term, adversely affected. We don't deny that as an ordinary use of the English language, you might regard this as an adverse effect. But the whole point of this Court's cases interpreting adversely affected and aggrieved is that those are legal terms of art. They don't refer to the... Well, how do you deal with a case like Bank of America? Bank of America was a Fair Housing Act case where there was a special definition of the term aggrieved person that the Court in the 1970s had interpreted to extend all the way to the limits of Article III. While more recent cases of the Court have questioned whether it really goes quite that far, it does go beyond the normal meaning of the term. You do agree, don't you, that adversely affected usually in administrative law includes competitors or includes others in the chain of distribution, the manufacturers, the retailers, the distributors, that usually can include all those as a matter of basic ad law principles? I agree with the first part of that statement. It certainly includes competitors in a wide variety of contexts. Almost all of this Court's APA zone of interest cases have involved competitors or other entities with interests adverse to the directly regulated party. This is a very different circumstance. This is an ally of the directly regulated party whose interests are derivative of that party. The only case I'm aware of that looks like that is Block Against Community Nutrition Institute, the case about the milk consumers and milk handlers. In that case, the Court said that the milk consumers didn't have the opportunity to sue. One of the reasons given by then Judge Scalia in his opinion in the D.C. Circuit was they're indirectly affected and the directly affected party is the more natural plaintiff. That's exactly the situation here. Isn't it conceptually, I guess, isn't it the case that the retailer's real interest kicks in when a product is marketed? So when it's on the market, then we say, okay, we understand that retailers can invest. They want to put it in their stores. They want to sell it to their customers. But I guess, conceptually, there might be a distinction between that and the retailer's interest in pre-market development and research. Wouldn't you think they would be sort of agnostic as to products in development from the retail perspective? That's absolutely right, Justice Jackson. I think this case suffers from a bit of an optical illusion, the fact that the products are on the market as a result of FDA's deferred enforcement policy. But in trying to figure out what Congress intended in the statute, it's helpful to put FDA's enforcement decisions to the side and look at how Congress anticipated that this scheme would play out. And it anticipated that this would be happening, this meaning the approval prior to market. Absolutely. That the denial that is at issue here is happening before this product ever is sold by anyone. And so then the question becomes, what is the retailer's interest in that? Exactly. And the question the court should ask itself is, would Congress have anticipated that you have a scheme where a retailer doesn't know this application process is going on, doesn't know that the agency has issued a denial order, probably doesn't even know that the product exists under the statute's confidentiality provisions. Does this retailer get to swoop in out of nowhere and within 30 days institute a judicial review? I think that's a very impractical understanding. The reason, it's not premature from one perspective, the reason the manufacturer is doing this stuff is because it wants to make a product that the retailers want to sell. And the retailers presumably will identify problems and the manufacturers will know about it and they'll try to undertake research, whatever, to fix it. I'm sorry, Mr. Chief Justice, it's not realistic to say that the retailers are contributing something valuable to the case. Look at this case, for example. The basic claim is that the agency unfairly surprised the applicant by changing the standards under which it evaluated the application. Now, the retailer has no idea whether the applicant was surprised or not because... Why do you say that? You don't think there's conversations or discussions or conferences, for all I know, between the retailers and the manufacturers of a product they sell? There may be, but the statute does not require that the agency even reveal the existence of the application to the retailer or the existence of the order. So the question simply is, does the manufacturer get to talk to the retailer on the side and thereby enlist the retailer to participate? The only reason for the manufacturer to do that is to try to get around the venue restrictions. It's not because the retailer is adding some facts or information or legal analysis to the case that the manufacturer couldn't have otherwise. You're analyzing it as if the statute only allows suit by the most adversely affected. The retailer is losing money, substantial money, that it would otherwise be able to potentially make, and that financial injury certainly sounds like adverse effect under any, as you would say, ordinary understanding of the term, but also any administrative law understanding of the term that I'm familiar with. No, but you could say similarly about the milk consumers in Block Against Community Nutrition Institute, that they were adversely affected because they had to pay more for the milk. Yet, Judge... Consumers are arguably analyzed a little differently than those who are in the upstream or downstream chain of production and distribution and sale. I respectfully disagree with that, Justice Kavanaugh. The entire point of authorizing these e-cigarettes, if they're ultimately authorized, would be to save the lives of consumers, would be to ensure that they can switch from more dangerous products like cigarettes to less dangerous potentially products like e-cigarettes. So if they're outside the zone of interest, then the retailers whose substantive interests Congress really didn't care about at all are certainly outside. Do you think that there's anybody who's adversely affected other than the applicant? No. So why didn't they just say the applicant? Because Congress drafted a provision covering both regulations and denials. And the fact that it yoked those two together in a single provision forced it to use a more general term, adversely affected. Yeah, I mean, you might think that they're yoked together because Congress meant for the same people to be able to sue with respects to both. But as I was... I mean, in the withdrawal section, it does use the word applicant. But the withdrawal section applies only to withdrawals. It doesn't also refer to regulations. And for that reason...  I was just thinking they knew how to use the word applicant. If they thought that the denials should only be about applicants, then they would have written a provision pretty much like the withdrawal provision that says with respect to a denial, an applicant can sue. Well, let me try it this way. The fact that Congress used the word adversely affected in one provision and the phrase applicant in the other provision certainly requires an explanation. One explanation is the one that respondents have offered, which is adversely affected covers people beyond applicants. But there's another explanation, which is that the provision covers both regulations and denials. And Congress was forced to use the broader term. There's also a structural implausibility in the other side's argument, which is that retailers are allowed to challenge denials, but are not allowed to challenge withdrawals. Withdrawals affect retailers far more directly than denials. It requires them to take off the shelves products that they have lawfully been selling. And yet in that context, Congress made clear that only the applicant is allowed to sue. Now, no one has come up with any reason why a rational Congress would have set up a scheme that way. Mr. Story, can I just ask you, I was a little surprised by your emphatic response to Justice Kagan that no one else fits into the category of adversely affected. What about some, I'm hypothesizing an interest group that really believes that the sale of flavored cigarettes is important for helping people to stop smoking, adults. And they really believe this. And in their research, this is a net positive, despite the effects on children or whatever else, because they have an interest in this particular product. Why wouldn't they be adversely affected for the purpose of this statute? Much as I'd like to be able to say that other entities would be included, I don't think we could say that. The reason that they're not adversely affected and they're not entitled to sue is ultimately the same reason the retailers aren't entitled to sue either, which is Congress set up a scheme in which they're not entitled to participate in the administrative process and they don't get notice of the order when it's issued. You're trying to ask, what is the group of people whose interests Congress was trying to protect? A good proxy for that is, whom did Congress allow to participate in the administrative process? Help me to understand then how you are reconciling the text, because I don't quite understand it. We do have text that says any party adversely affected on the one hand with respect to denials, and we have text with respect to withdrawals that say the holder of an application. You are interpreting those to be equivalent, but they're different language. So how is it that we arrive there? We are not interpreting them to be equivalent. One requires the court to apply the zone of interest test, and with respect to a subset of the agency actions covered by the provision that refers to adversely affected, with respect to the denials, it turns out that the only people adversely affected are the applicants. I just wanted to take you to the venue question. Your venue enjoined your argument, I just don't want your time to expire before we talk about that a little bit. Let's assume that I think we have the discretion to reach it. The Fifth Circuit, we don't have a lot on it, and there's not a circuit split on it. We have a couple of Circuit Court of Appeals opinions. Assume that I think we have the discretion to do it. Why should we do it, and do we risk, I mean normally we wait for things to percolate and develop so that we don't inadvertently forge ahead into areas where we might disrupt things. So why wouldn't that prudential concern apply here? You should do it because the degree of forum shopping that has happened under the Fifth Circuit's decision so far has been quite remarkable. In 2024, we counted about 14 petitions for review filed by e-cigarette companies under the Act. But wouldn't this have ramifications outside of the TCA, I mean, that's a little bit what I'm concerned about here. The government gets sued in a lot of places, and this would matter beyond just the TCA, correct? It could, depending on how you rule, and I could offer the court a way to limit its decision to statutes that are phrased just like this statute. The court could set aside the question of what is the default rule for suits against the government, whether everyone must have venue or only one party must have venue. And it could just focus on the language of this statute. It says that an adversely affected person may file a petition for review in the circuit where the person resides or has its principal place of business. The key verb there is file. I take my friends to be drawing a distinction between... The key verb is file. I just didn't hear. I take my friends to be drawing a distinction between filing a petition and joining a petition, but that argument ultimately doesn't stand up. When four different entities jointly file a petition, every single one of them is a filer of the petition. Reynolds is just as much a filer of this petition as the retailers are. And the question is, are they filing their petition in a circuit that the statute permits them to? And they're not. They're not filing in the circuit where they reside or have their principal place of business, and they're not filing in the DC circuit either. Some of the... I'm sorry, did you finish that sentence? I'm finished. Some of the amici claim that there are as many as 650 review provisions that are similar to the one here. So how many of those... Can you tell us how many of those would be subject to the limitation that you just set out? I don't have an exact number, Justice Alito, but the amici are including in their numbers the general venue statute, which refers to suits in district court, and the Hobbs Act. But both of those are worded very differently. They don't talk about where a person may file a petition. They just say where venue is proper and use terms like the petitioner or the... Well, there are a lot of statutes that have specific, specified venue provisions, right? Yes. And would this apply to all of them? Would our decision here apply to all of those? Not necessarily all of those. Some of those are worded like the statute here. I think the only example cited in the parties' briefs and the Chamber of Commerce amicus brief are the Investment Advisors Act and the Natural Gas Act. Yes, it's true that other statutes that are worded the same way as this statute would be interpreted the same way as well. And what about 1391? Would this be a way essentially to bracket 1391, or would 1391, you know, is it similar enough so that we might be taken to say something about 1391? While we would very much like an opinion that addresses in dicta 1391 as well, the court doesn't need to go that far. The court could say, we're just focusing on the language of this statute. Sure. I'm just saying, you know, is your suggestion, which is you don't have to rely on any kind of default rule about the government, and instead just focus on the language of the statute, what do you think, candidly, honestly, that would suggest or not about 1391? What that would take away in the 1391 cases is this argument, which I think is wrong in the first place, that there's some special rule for suits against the government. What would be left in the 1391 cases is simply to analyze the language, history, and purpose of that statute, applying the normal rules of statutory interpretation. While we think we have the better of those arguments, those would be the issues that the courts would have to resolve in that context. Mr. Suri, I thought when I read the venue statute at issue here, not that you were relying on the word file, but that you were relying on the explicit use of something that's not in the other statutes, at least the ones that had been brought to our attention in the briefs. The language here is, any person adversely affected may file a petition for review in their residence or the District of Columbia in which such person, it was the word such person, which is missing from all the other statutes. And I may be wrong, but I think it's missing from 1391. It is certainly missing from 1391 and the Hobbs Act. It's missing from the most important statute. Those were the two I looked at. That's why I'm not sure, I know you'd like us to say that the government should not be I'd prefer to win as big as I can get away with. But if the court is concerned about issuing a broad ruling, it can certainly focus on the words file and such person, which are not unique to this statute, but which do distinguish the statute from the others that the other side is most concerned about. What do you do with your forfeiture? Meaning, Justice Barrett said we might have equity to go by, and I do understand the forum shopping concerns that you have, but what do we do about the forfeiture? The issue was passed upon below and was How, if you forfeit, you didn't raise it explicitly in this way. It was passed upon at the top of page 3A and the bottom of page 5A of the petition appendix where the court of appeals stated that venue is proper because two out of the four parties have their principal places of business within the circuit. We didn't raise it in this case because we were foreclosed from doing so by circuit precedent. They argued that we didn't raise it in a previous case as well, the circuit precedent that foreclosed the issue in this case. But I'd like just to quickly put that in context. There the issue arose initially on a stay motion. We said there's a question as to venue, but we can't be sure because the record doesn't show where all the parties reside. They in their reply brief said it doesn't matter because one party resides in the circuit. And then the Fifth Circuit issued a published opinion accepting their theory. We never really had a chance to engage on that issue. The Fifth Circuit issued a published opinion that was binding precedent in this case. We tried to make arguments that weren't foreclosed by that precedent, but the Fifth Circuit rejected that as well. So all of that is properly before this court. And then what's your view of what question you brought to us? We brought the question whether a manufacturer can sue in the Fifth Circuit if it doesn't reside there or have its principal place of business there. And we gave two different reasons why they're not able to do so. The court could address either of those arguments in either order, and it would be sufficient to reverse if it agreed with us on the second part. Thank you, Counsel. Justice Thomas? We're definitely not talking about jurisdiction here. We're merely talking about venue. And when I think of venue, I normally think of convenience to the parties. As a practical matter, why is it inconvenient for the government to litigate in one circuit versus another? It's not inconvenient for the government. So what's this all about? It's about Congress's choice in the statute. Congress could have passed a statute that said you can sue the government anywhere you want. It chose not to do that. It specified particular venues. I think it had good reasons to do that. One is to minimize opportunities for forum shopping, ensuring that cases can percolate among multiple courts before they get to this court. Contrast wages, where you had cases from eight different circuits that addressed the question before it got to this court, to what's happening now, where almost all the cases are being filed in the Fifth Circuit. Congress had good reasons. Seems like it's convenient for you, then. Well, it's the statute Congress enacted, and that's what we're asking the court to apply. So does it have anything to do with your not winning in the Fifth Circuit? We neither like nor dislike the Fifth Circuit, Justice Thomas. What we dislike is for the other side to be able to choose whichever circuit is most convenient out of all 12 in the country. Justice Alito? Suppose a retailer continues to sell abused products and is criminally prosecuted. Could that retailer assert that the denial was unlawful as a defense in the criminal proceedings? There would be no jurisdictional bar to the retailers doing so, as there's nothing like the Hobbs Act issue that you'll be hearing about in the second case this morning. We would simply argue that the retailer's defense would fail on the merits. The statute says that the product may not be sold without authorization. And regardless of whether the denial was lawful or unlawful, that doesn't result in getting an authorization. That's like a driver driving without a license and saying, I should have been issued the license, but I wasn't. That usually wouldn't be regarded as a valid defense. Your friends on the other side say that this dispute is basically irrelevant because petitioners challenging the same agency order in different circuits, petitions, I'm sorry, challenging the order in different circuits, will eventually be consolidated. What's your response to that? The response to that is that the multi-circuit petition process includes a provision that says that a court at the end of that process determines the most convenient form and can send the cases to that form. They have circumvented that ability of a court to identify the most convenient form. By allowing them to use the tactic that they've used, they can unilaterally send the cases to whichever court they prefer. Thank you. Justice Sotomayor? Explain that to me. I thought the multi-circuit rules required that the first filing controls, correct? The first filing controls if there's one filing in the first 10 days and then further filings after the first 10 days. But regardless of whether the first filing controls, the court in which the petitions are consolidated can receive a motion to transfer the case to what it regards as the most convenient form. And we have cited authorities saying that preventing gamesmanship is a valid basis for granting such a motion. So if they tried some tactic to engineer the cases to get to the Fifth Circuit, we would respond potentially by filing that type of motion. They prevented us from doing that by not invoking the multi-circuit process. I see, by filing everything in the Fifth Circuit and joining everyone there.  Got it. Justice Kagan? Justice Gorsuch? Mr. Suri, on the second question, you say it's not inconvenient to litigate in the Fifth Circuit for the government. I get that. But you say that there's form-shopping concerns by allowing manufacturers to piggyback. Is that right? Those two things, we can hold those two ideas in our head at the same time? Yes. Okay. If we got rid of the manufacturer's piggybacking, what would stop manufacturers from simply funding retailer suits, and we'd wind up in exactly the same place? The first problem with that would be that there is a question about the scope of the relief that would be issued. The statute uses the phrase set aside, and I know there's been some debate about whether that allows for universal relief or party-specific relief, putting that aside. So it may be that there's relief only for the retailer. I understand that. Putting that aside, there might be additional reasons why a manufacturer is unable to fund the retailer. For example, the contents of the application often include trade secrets that the manufacturer may not be willing to share with the retailer. But suppose the manufacturer is? Well, then that's the price that the manufacturer is paying in order to... It may well be... We could wind up in the same place, is I guess what I'm driving at. Third-party funded litigation is not unknown in this country. It is... The ingenious lawyers representing the applicants could come up with... You're pretty ingenious, too, Mr. Suri. Don't sell yourself short. May come up with some way to circumvent the ruling. I agree. But that is no reason not to enforce the limitations that Congress has set up. I understand that. And then, back on the first QP of how I perceive it, you rely very heavily on block in your brief. Your friends on the other side say, well, that's a different venue statute there. It said... Let's see. You can... It may be brought in a district in which such handler, the milk handler, is located, rather than consumers or parties grieved or anything like that. So what's your response? I'm sure you've got one. I certainly do. The response is that the suit was not brought under that provision. The suit was brought under the APA. Understood. But the court relied on the overall statutory structure in understanding what the zone of interest in that particular statute was, informed in part by that provision, as well as the fact that, I think there, the producers or the handlers had a vote on the regulation. And here, I don't think the regulated community gets to vote on what you decide. The factors, the structural factors that the court in block... Yeah. Why aren't those distinguishable, I guess, is what I'm saying. There undoubtedly are some factors that are distinct, but the most important factors the court relied on also apply here. First, it relied on the fact that the milk consumers played no role in the agency process. That's true of the retailers here. Second, it relied on the fact that the consumers were indirectly affected. I understand that, but I'm not asking you to discuss the points of similarity. I'm asking you to address the points of dissimilarity. Yes, I acknowledge that there are points of dissimilarity. We're not saying this case is 100% controlled by that case, but we are saying the most important factors are points of similarity. Got it. Thank you. Justice Kavanaugh? On consumers, that would open it up to basically anyone to sue. Potentially. Right. And that's potentially a problem, or at least the court might think that that's a strange way to read a statute that's distinct from retailers. It's not going to present that kind of problem. But I think that's a problem with respondents' position. The provision directing FDA to evaluate applications explicitly requires it to consider the consumer's  interests. It is weighing the risk to their health against the benefits to their health. And if they're not allowed to sue, then I would think that the retailers, who aren't even mentioned in the section, are even less entitled to sue. In response to Justice Thomas, and I might have misheard you, so just correct me if I did, I thought one of your answers about the Fifth Circuit was that prevents multiple circuits from being able to address the issue. Was that one of your answers? Yes. Well, doesn't the 2112 process yield the same issue? And you say that's perfectly appropriate, of course it has to be. The 2112 process will result in a single order being challenged in a single circuit. So that's true. But there are multiple applicants with multiple orders all over the country. What's happening now is all of these applicants, whether they're in California or Michigan or Ohio or even China, are going to the Fifth Circuit to sue. What would happen in the world that we think Congress envisioned is that California applicants would go to either D.C. or the Ninth Circuit, and Ohio would go to the Sixth Circuit, and Florida would go to the Eleventh Circuit. And that way, similar orders would be addressed in different circuits. That's what's not happening right now under the Fifth Circuit's decision. Thank you. Justice Barrett? Mr. Suri, I want to say something about what it means to be adversely affected or aggrieved, and then I want you to tell me if we're understanding it the right way. Would you say that it's fair to say that the terms adversely affected or aggrieved have gained a particular meaning in the context of the APA when they're used elsewhere, like in the TCA, they bring that old soil with them, so we would understand them to have that capacious APA-style meaning unless aspects of the statutory structure in the Organic Statute overcome that. Do you think that's fair? No. Okay. The terms adversely affected and aggrieved acquired a legal meaning even before the APA in the context of agency-specific statutes and non-APA statutes, and the Court has been applying that meaning in the context of non-APA cases even after the 1978 APA cases. So it has acquired a special meaning in the APA context that is more lenient than its meaning in other contexts. So it has kind of a term-of-art old soil meaning in this other line of cases? Yes. Okay. Justice Jackson, anything further? Thank you, counsel. Mr. Watson? Mr. Jackson? Thank you, Chief Justice, and may it please the Court. This Court lacks jurisdiction to hear this case, as we explained in our brief, but if the Court does reach the merits, it should affirm. The Tobacco Control Act allows any person adversely affected to challenge a marketing denial order, and retailers easily qualify. The TCA contains two judicial review provisions that allow for three types of challenges. For withdrawals of marketing authorization, Congress limited review to the applicants. For tobacco product standards and marketing denials, the latter of which is at issue here, Congress permitted review by any person adversely affected. By allowing any person adversely affected to challenge denials, Congress plainly intended to extend review beyond the applicant, and the retailers are the next in line. That plain text point is underscored by this Court's ordinary zone of interest test, under which an entity harmed by agency action falls within the statutory zone when its interests are arguably protected or regulated by the statute. And here, the retailers' interests are directly related to the statute, because the provision under which FDA denied authorization governs what products may be sold, and the denial prohibits retailers from selling the products. Indeed, the harm to the retailers here could not be more plain. Retailer-availed Texas would go out of business if it could not sell views products. Finally, by failing to raise it below, FDA forfeited its argument that each petitioner must independently establish VENYA, but FDA is wrong anyway. Congress enacted the TCA against a uniform judicial interpretation, holding that in cases challenging federal action, only one challenger needs established VENYA. In any event, ruling for FDA on this issue would change nothing. All four entities here would still end up in a consolidated case in the Fifth Circuit. Therefore, the Court should dismiss the writ or affirm the order below, and I welcome the Court's questions. Why do you think Congress would treat denials and withdrawals differently? So as your question suggests, Justice Thomas, Congress did distinguish between those two scenarios. The plain text makes that clear, and if we think about why that is the case, it's helpful to look at 387JD, which is the provision that governs withdrawals. The seven out of the eight reasons for issuing a withdrawal are focused on the applicant. For example, untrue statements in an application, or misleading labeling of an applicant, or not maintaining the facilities properly from the applicant. It's a very applicant-focused decision by the agency. And then, if the agency is considering withdrawing authorization, there is a notice-in-hearing process that is laid out for the applicant to participate before the agency, before the withdrawal is issued. So it's evident throughout the statutory structure and the other provisions that withdrawals are very applicant-focused. By contrast, a marketing denial is much more broadly focused as to whether the products may be sold. And in that respect, the applicant and the retailers have the same interest, which is selling the product. But what else can you do, meaning retailers have no greater rights if the manufacturer fails to do something in the administrative process, you can't make it up. You come in with the exact same rights for approval that the manufacturer has exercised or not exercised. The decision that the agency is making under 387J is whether to authorize the marketing, the sale of the products, and in that regard, the applicants and the retailers are similarly situated. They both have an interest in selling the product. Tell me what you can do that the manufacturer can't do in challenging the order. You're stuck with the record the manufacturer created, correct? The administrative record would govern a challenge filed by retailers or by applicants. What arguments could you raise that would be different than the manufacturer's? So I take your question, Justice Sotomayor, to be getting at why would retailers be involved in the litigation process? What do they add to that? What additional arguments could there be? And in that regard, I would point the court to the fact that when a marketing denial order is issued, it's very important to everyone in that distribution chain to seek a judicial stay of that order immediately so that the products may continue to be sold. And we went into court immediately and sought such a stay. When making that argument, the irreparable... But the manufacturers could have done that if they really thought it was necessary. But they can't do it unless there's something inadequate in the record, correct? Both the manufacturers and the applicants jointly did that in this case. And my point was that in seeking a stay, irreparable harm has to be established. And the fact that, for example, Avail, Texas, one of the retailers here, will have to go out of business if it cannot sell the business. I fully understand the harm, but it's identical to withdrawal. So you're going to be harmed in any situation whether there's approval not given or it's withdrawn. But, Mr... It is true that... I am asking you, what rights in the administrative, what arguments, what evidence, what anything can you present that would be different than the manufacturers? The retailers can make the same arguments, and it is based on the same administrative record, Justice Sotomayor.  Sorry. Go ahead. But here, Congress has distinguished between the withdrawal scenario, which is limited to the applicants. Yes. And that distinction is what really bugs me about your position, because I think we would all agree that the retailers have a significant interest once the product is on the market, that they have purchased it, they have stocked their shelves, they are ready to go. In fact, they might even have sales numbers, where it's been out there, and now their skin is really in the game. And yet, in that situation, in which they would be clearly harmed, if suddenly approval was withdrawn, Congress has made clear that they don't have the ability to sue. And so it seems just at least peculiar, if not, in my view, sort of undermining your argument that the retailers have an interest in the pre-market scenario, that would entitle them to sue. The fact that Congress has said, in the very situation in which we would expect that retailers would be able to come in to protect their own interests, Congress has not allowed them to. Justice Jackson, I think I would answer that in two parts. The first is that very strong interest that you identify, we agree, and that is implicated here, because in this case, these products are on the shelves. Can we just pause, let's talk about the post, because I do want to get back to that, but I agree with you that once the product is marketed, and the retailers, I think in some places, they actually purchase it to sell to their customers, I mean, they are in this thing. That's correct. Congress says, if the FDA withdraws its approval of products that they have already purchased and stocked their shelves, they can't sue. So, that suggests to me that Congress was really not, in this statute, protecting retailers' interests. It is absolutely true that in the withdrawal scenario, they cannot sue, but Congress here drafted a separate provision that says any person adversely affected by the challenge of marketing their product... No, I understand, but we have to try to figure out what Congress wanted with respect to whether retailers were in the class of people that should be entitled to sue, and the clue from the statute here is that Congress was not focused on retailers, because if they were, they really would have given retailers the ability to sue where their interests are most seriously affected. Let me ask you about the pre-market assumption that retailers and manufacturers actually stand in the same shoes. I guess I'm not sure I understand that, because it would seem to me that retailers really get their interest from marketed products. Again, once the product is on the market, the retailers come in, they buy it up, they do whatever, and they're ready to sell it to customers. I'm not sure that they have the same interest as a manufacturer in pre-market, pre-development, is it going to be approved or not? So, can you say more about why you're just assuming that retailers and manufacturers have the same interest in the pre-market scenario? Absolutely. It's clear that retailers are the next in line in terms of the harm suffered behind applicants, and the reason is that they want to sell these products, whether it's on their shelf right now, or they just have a desire to do so for their business purposes. But why is that a harm? Why is that a harm that Congress would want to protect here? I mean, it seems to me that retailers just want to sell some tobacco product. They see that this product might be developed. Mr. Suri says they don't even see that, because this is happening confidentially, but fine. They hear about this kind of product, and they're excited. Okay, I understand that, but why are they harmed if that product never gets approved? Because Section 387J, which is the core section that we're talking about here, governs whether the product may be introduced into interstate commerce, and retailers have business interests in selling certain products over other products. They don't just want to sell some product. Here the retailers want to sell these products, and the thing that is stopping them from doing So say I'm a customer out there that really is interested in a flavored tobacco product, because I think it's going to help me to stop smoking. And so just like the retailer, I hear about it, I really want to buy it. Is that person adversely affected for the purpose of the statute? The difference is that the statute here prohibits the retailer from selling a product that has to do so, which include imprisonment, civil monetary penalties, injunction, and seizure. None of that applies to a consumer who wants to purchase the product. Can I flip you to your other argument, Mr. Watson? So let's assume that a retailer is adversely affected for purposes of this question. So a person adversely affected may file a petition for review with the D.C. Circuit or the circuit in which such person resides. Such person is the person adversely affected who files a petition for review. How do we read that any other way than that each person petitioning for review do so in either the D.C. Circuit or that person's home district? Justice Kagan, the way to read that is in light of the decades-long uniform judicial interpretation of nearly identical venue provisions that govern suitability of tobacco products. I want to let you talk about that, but if that's the first sentence out of your mouth, it's kind of a concession that this language taken on its own is best read against you, is best read for the government. We don't concede that, but we do think that our best textual argument is you read that text in light of how it has been interpreted by courts and how we assume that Congress had in mind when it enacted against that. But we don't concede. I'm happy to discuss the other reasons. Well, okay. Give me the other reasons. Just on the text itself. I mean, I want to know how to read that text your way. So, at best for the FDA, the text is ambiguous because, yes, it refers to such person. It also refers to their, which is plural. In 1 U.S.C. 1, the Dictionary Act says that singular can refer to the plural. I would also point out that even if it is singular, it doesn't actually answer the question here. So, let's assume it's singular. That just means that at least one person has to satisfy it. It doesn't mean that every person has to satisfy it. And that's essentially the rewriting that FDA's position does, is rewrite it to say every person has to satisfy it or all persons have to satisfy it. Well, I take the point that it doesn't say, and we mean, and then answer the question in this case. But, you know, usually you look at a statute, it says such person. We're talking about a person. That's the person who's filed and that person has and is given two choices, D.C. Circuit or the circuit in which the person resides. Justice Kagan, the other point that I would make on this is that nothing in the Tobacco Control Act overrides the operation of basic joinder principles. And the four respondents here filed the petition for review invoking Federal Rule of Appellate Procedure 15. 15A is what allows joinder where practicable if the parties are challenging the same order and have the same interests as is the case here. So nothing in that provision overrides the background operation of joinder principles which support our position and our approach here. Can you address, going back to the first argument, all your responses to Block? Yes. Happy to do that. As an initial matter, Block supports our approach for how you look at the statutes to construe what the zone of interest is. It looks at all of the relevant provisions in the entire structure of the statute, which is what we are suggesting that this Court should do. The reason that Block is distinguishable is that included a collaborative price-setting process set out in the statute, where, as Justice Gorsuch mentioned, the members of the industry, the handlers, and the processors had votes as to the price setting. And then there was an administrative review mechanism which was limited to handlers and did not involve consumers. There then was a judicial review provision that was limited to handlers and not to consumers. The consumers had to go outside of all of that and invoke the APA in their own lawsuits. And the Court said, and this really wasn't even a zone of interest case. It was a case about precluding judicial review. The Court said, well, the structure of the statute precludes judicial review there. That would be like if consumers or perhaps even retailers tried to file a district court APA challenge to a withdrawal decision. This statute in the Tobacco Control Act has an administrative review process for withdrawals and it's limited to applicants. And it has a judicial review provision for withdrawals and it's limited to applicants. If someone other than an applicant ran to district court and filed a challenge to a withdrawal decision, the Court might say, this statute precludes judicial review of a consumer suit in that context, but that's not what we have here. Here the TCA expressly distinguishes between applicants on the one hand and any person adversely affected on the other. So once we decide that someone other than an applicant is included with any person adversely affected, the next question for the Court is, who's the next in line in terms of being harmed? And here that is plainly the retailers. The retailers here are subject to a prohibition on selling the products after the denial and are subject to severe penalties if they violate that. And indeed, the FDA press releases that accompanied the marketing denial orders for the views of the retailers if they continue to sell the products. So it's hard to see how retailers in that context would not be adversely affected by a marketing denial. And as I noted in my opening... That doesn't... They're still... It would have to... Sorry. Go ahead. I was just going to ask if you could respond to the same question that I asked Mr. Suri about the meanings of the terms aggrieved and adversely affected. You know, I asked him whether they had a special meaning that they'd acquired in administrative law that we assume presumptively applies elsewhere unless the statutory structure overcomes it. And, you know, he responded that really they have a longer common law meaning that brings the old soil and that the APA is, as I understood his answer, unique. What's your understanding? My understanding is that if we just look at the plain text here, we plainly prevail. But I do acknowledge that the court has applied a zone of interest test in these contexts and that any person adversely affected has a meaning under those tests. Where I would disagree with my friend is the notion that the court's usual lenient zone of interest test has not been applied outside of the APA context. The Bank of America case is an example. That was a Fair Housing Act case and the court applied a very lenient version of that test which included the word arguably. The Thompson case was a Title VII case. That likewise applied the usual lenient version and it used the word arguably. But when you say usual and you point to the Bank of America case, I mean, really what you're saying then is that the lenient test from the APA generally applies absent. Yes. And, in fact, this court in the Bennett decision at page 163 indicated that the usual test applies unless the statute expressly indicates otherwise. In that case, any person was the phrase in the Endangered Species Act. And so the court said, well, that indicates otherwise. That's even broad. Here, there's no express overriding of that test. And, in fact, the language of the judicial review provision at issue here is verbatim the same as the APA judicial review provision. And let me just ask you one question about venue. You know, your friend on the other side says, you know, oh, no, no, no, don't worry about it. You know, Mr. Suri said we could have a large win on the venue joinder issue and we would be happy with that. But a small one would be fine, too. And if we confine the holding just to the TCA, he said that would be, you know, we could assure ourselves that we wouldn't cause damage elsewhere. What risks do you see if you lose on that issue? If we lose on that issue, it is hard for me to see how it would be cabined to just the Tobacco Control Act context, because the Tobacco Control Act's language is quite similar to the Hobbs Act, and the Hobbs Act is quite similar to the Federal General Venue Statute, all of which have been construed to allow just one party to establish venue. I don't think that's quite right, Mr. Watson. I mean, you do analogize primarily to the Hobbs Act, and the Hobbs Act strikes me as very different. The original version of the Hobbs Act allowed for venue where any of the parties filing the petition for review resided. That was the original version. And then they maintained that meaning by just defining in their definition of petitioner. So the current version does the exact same thing by reference to a definition, but it makes it clear that you can get venue where any of the persons filing the petition for review resided, which is exactly what this section does not do. Respectfully, Justice Kagan, none of the cases we point to under the Hobbs Act rely on the definitional provision, and indeed, none of them even refer to that. I acknowledge, of course, that it was amended, but that is not the basis for those. Well, whatever the basis was and whether they were just sort of thinking about the old Hobbs Act so they didn't have to say, oh, you know, the new Hobbs Act does the same thing by using a definition. I mean, it does do the same thing by using a definition. And what the Hobbs Act does and has always done is to say where any of the parties reside, that's where you can file. What the courts in the Hobbs Act cases were largely doing is looking to the context in the previous interpretations of the general venue statute and how that had been construed. So the Railway Labor Executives case from the Ninth Circuit is an example of construing the Hobbs Act in light of the federal venue statute, and as this court has seen, the courts of appeals have uniformly held that the federal general venue statute allows only one petitioner to establish venue. And that's because Congress, when it enacted that statute, was expressly trying to open up and broaden the venues that are available when entities are challenging governmental action. The Sydney Coal case from the Sixth Circuit is a good example of a case that discusses that, those policies. But isn't that a different purpose than is at issue here? I mean, I think what's a little concerning is that if you're right that only one party needs venue here, it seems to directly undermine Congress's intent to channel these kinds of actions in a particular way. It seems like the statute gives those who are adversely affected by the denial two choices in terms of venue. They can file in the D.C. Circuit or they can file in the circuit in which they reside. If you're right, neither of those become limitations on people who want to sue. And so I guess I don't understand how your only-one-person rule works consistently with what Congress is trying to do here. Respectfully, Justice Jackson, our position does not nullify the venue provision, as my friend suggests, and there are a few examples I can give to demonstrate that. One is that not all products are sold nationwide. Many e-cigarette products are sold by mom-and-pop vapor shops on a street corner, and those mom-and-pop vape shops have to seek authorization for each of their own e-liquids in the products. If they do so and they receive a marketing denial order and wish to challenge it in court, they are not going to be able to sue all over the country. They're only going to be able to sue in the relevant locality where they sell those products. But even if we address the context of a product that is sold nationwide and thus is on retail shelves... Are you saying that Congress is not aware that some products are sold nationwide? I mean, the venue provision has no carve-out for national products versus local products. It seems pretty clear that you have a choice. If you don't want to sue where you reside, you can bring your suit in the D.C. Circuit. I'm simply suggesting that the nullification argument by my friend is not well put because there are scenarios where venue, even under our view, will impose an obstacle to the lawsuit being filed. Well, but that's not the question I'm asking. I'm not saying do you always get away with it. I'm saying why would Congress have set up a statute or scenario where in the vast majority of cases you can just do an easy end run around these limitations? Because as discussed in many of the cases that interpret the general venue statute, Congress has expressly intended that when entities are challenging governmental action, they should have many venue options available to them and they should not have to go just to D.C. That's the effect of what the government's argument is here that we can only file in D.C. together, but that is not consistent with Congress's intent. Normally, venue is a protection for defendants in the ordinary run of cases, but that policy reason is flipped. Are you saying that Congress couldn't craft a statute in which it was trying to channel the venue in this way, in a way that was not a protection for defendants? Congress was trying to ensure that these kinds of cases go in certain forms or that they're being litigated all over the country and not just in one place chosen by the defendants? Congress certainly could craft a statute that makes venues very limited or makes there be very many options. My point here is that the statutes that we're looking at, read in the context of other statutes that authorize suits against the federal government. Why do we have to read it in the context of other statutes? Why can't we look at what Congress was doing in this statute? We read it in context of the other statutes under this court's decision in Bragdon, in the Texas Department of Housing case, when there is a uniform interpretation by the lower courts. We assume that Congress intended the words that it was enacting to have the same meaning that those uniform courts have held. Here, that supports our position, but as I was also discussing earlier, even setting that ish argument to the side, basic joinder principles here support the fact that the four respondents can and did jointly file a petition for review under federal rule of appellate procedure 15 in the Fifth Circuit. There's nothing in the Tobacco Control Act that overrides the ability of the petitioners to do so. I would also note that if we prevail on the first question and retailers are indeed allowed to sue, the second question really is not one that the court needs to reach, both because of the forfeiture argument that we made in the briefs, but also because 28 U.S.C. 2112 A is going to result in all four of the respondents being in the Fifth Circuit in a consolidated case challenging this marketing denial order. So it's not going to make a difference in this case. Can you explain that further, why that's the case? Yes, because in this instance, the four respondents jointly filed their petition within the first 10 days after the marketing denial order. The government raised a venue objection very quickly, and so within the 30-day timeliness window, but outside of the first 10 days, we went to the D.C. Circuit and jointly filed what's referred to as a protective petition there, and that's just been pursuant to the agreement of the parties in the court held in advance in case we don't prevail on the venue issue in the Fifth Circuit. If we have the scenario that I was just discussing, the retailers will be able to still say in the Fifth Circuit, but Reynolds, the applicant, will be transferred to the D.C. Circuit. I would like you just to finish that answer, please. The protective petition will come alive at that point, and pursuant to 28 U.S.C. 2112 A, the petition will be transferred to the only court in which there was a first 10-day petition in the Fifth Circuit, and then they will be consolidated. That's all mandatory under the statute. One other question. On the forfeiture, I'm struggling a little bit with that argument because it's a circuit-found venue, and so it didn't necessarily pass upon the question, even if it didn't discuss it. So it's conceded that it wasn't pressed below, and I don't think that the opinion below is fairly good as passing upon this either. The government was seeking relief below that is inconsistent with its theory now. It was asking that the case be transferred to the Fourth Circuit or the D.C. Circuit, which their theory now is we couldn't ever be in the Fourth Circuit. I think that demonstrates the court wasn't considering the issue that we're discussing now. Yes, they did comment in the opinion that in addition to establishing standing, two of the petitioners were located in the circuit, but that's the extent of it, and these issues that we're discussing now were not put before the court, and I don't think fairly are read as having been answered by the court. But in any event, the other reasons why the second question doesn't matter are what we discussed before and the fact that the retailers and the applicants are seeking the same relief, namely to set aside the order. Counsel, given 2112, the Fifth Circuit still retained, I'm sorry, there still exists an equitable decision by it about whether it should transfer to the D.C. Circuit, meaning the manufacturer filed there outside the 10-day period, but it filed there. It has all of the materials. It was the party responsible for the application. Many parts of it are under seal, and shouldn't it be the D.C. Circuit who decides how much of that the retailer should see? There may be some things, Justice Gorsuch, assume the manufacturer might let the retailer look at everything. I'm not so sure, but that could be litigated by the court. So it's not an irrelevant decision by us to say where each party has to file. It is in the sense that the operation of the statute will result in mandatory transfer and consolidation of the map. No, what the government is saying, it could make an application, and the court still has equitable powers under 2012 to decide differently. Correct. What I understand the government to be saying is that, yes, the process that I just described will play out, but after it does, and everyone is back in the Fifth Circuit, they reserve the right to file a motion to transfer based on convenience at that point, and I do agree that the statute allows such a thing. That was my only point. But my friend conceded that it's not inconvenient to the government to be in the Fifth Circuit, which entails just sending the Department of Justice lawyer to the Fifth Circuit for  No, but it could argue gamesmanship. Having said that, on the zone of interest test, I agree with the government in part and with you in part. There is a common law zone of interest that is different from the APA, and we haven't routinely applied the APA test. We sort of look at the language of the statute and its structure, and that's the only point they're making, which is there isn't a routine application. In Bank of America, for example, the case you rely on, we chose the APA formulation and even made it broader because we said the language was broader. We've done that a couple of times. And so I don't think, and the government hasn't pointed me to a statute where we narrowed it necessarily, or maybe I'm wrong about that, I don't remember, but the point still remains that I don't think we can do this as a common meaning understanding of what aggrieved means. I'll take that in two parts, Justice Sotomayor. The Bank of America case was applying the ordinary zone of interest test, and yes, there was previous case law under the Fair Housing Act that had said, well, we think aggrieved person extends to the full parameters of Article III, and that was actually disputed whether that precedent was still good law in that case, and the court said, we don't need to resolve that. We're just going to apply the ordinary test, and that's why we think it supports our position here. But even setting that aside and just looking at the text and the structure of the statute, we think that it's quite clear that retailers are within the zone of interest because the text distinguishes between applicants on the one hand and any person adversely affected on the other. I know the arguments. Thank you. Is it your position that adversely affected as a general proposition, usually when there's a regulation of a manufacturer, adversely affects a retailer and vice versa? I think that often will be the case, but to answer that, we have to look at the organic statute at issue in context, and here it's quite clear that it would, and in many contexts it will. In the ordinary, of course, it's possible that there would be a statute that makes clear that retailers are outside the zone. For example, a retailer trying to challenge a withdrawal here would be outside the zone because the text and structure of the statute are so clear to that effect. Well, and the economics of the situation, isn't that the key?  Absolutely. Normally it's going to impose costs on retailers if there's increased regulation of manufacturers as well as distributors, and similarly throughout the upstream and downstream chain, right? Absolutely. I agree, and the Fleming decision from this court is an example of a case where the court looked to various entities in the distribution chain and held that they were all within the zone of interest. And so when there's under-regulation of someone, a competitor, usually is disadvantaged.  Thank you, counsel. Justice Thomas? Justice O'Meara? Justice Kavanaugh, anything further? No. Justice Barrett? Justice Jackson? Can I just ask a quick question about enforcement? If the retailer continued selling the bubblegum flavored e-cigarettes after a withdrawal, could the FDA initiate enforcement action against it? Yes. Now, to be clear, bubblegum products are not at issue here. These are menthol products. I apologize. Yes. If there was a withdrawal of a product, could an enforcement action be brought against the  Yes, because the retailer would be selling the product. Would be in violation. Right. So I guess, and yet still Congress did not, you concede, allow for retailers to challenge withdrawals. Perhaps they could make a challenge as applied as a defense in that enforcement action, but I do concede that as a facial matter, challenging a marketing denial order, which is what we're dealing with here. But you still say that the enforcement possibility would yield the result that retailers should be allowed to challenge the denial on the front end because of enforcement.  I was just questioning how far your enforcement goes. Correct. Correct. Here, the retailers are subject to the prohibition and the penalties, and FDA has expressly threatened enforcement, so this is an easy case to identify that retailers here in this context certainly are within the zone of interest. Thank you. Thank you, counsel. Rebuttal, Mr. Suri? Justice Barrack, you asked why it's important to resolve this case, why the court should exercise its discretion to do so. The practical reason is that a lot of these cases have been piling up in a single circuit. In 2024, by our count, if you omit protective petitions, about 75% of e-cigarette cases were filed all in the Fifth Circuit, all of them by out-of-circuit applicants trying to use the tactic that was approved in the decision below. If the court doesn't resolve this issue now, then petitions will continue to pile up in that circuit. Potentially, you'd have to reverse those venue decisions years down the line, and all of those cases would have to be distributed again all over the country to be done from scratch. It's more efficient for the court to resolve the issue now. Justice Sotomayor, you asked about if there's ever been a case in which the court has narrowed the zone of interest test rather than broadened it. The best case we have for that is Lexmark, where the court interpreted the Lanham Act's unfair competition provision to protect the interests of competitors but not the interests of consumers. Justice Kagan, if I could address your question to Mr. Watson about what textual argument they have based on the language of the statute. I think respectfully, they didn't have a textual argument about how such a person could possibly be interpreted to allow a manufacturer to sue based on a retailer's residence. They went instead to the Hobbs Act and the General Venue Statute. But as you rightly pointed out, the Hobbs Act includes a different definitional provision and different history. The General Venue Statute includes different language. It was passed with a different purpose. So the narrower way to resolve this case is just to look at the language of this statute and to say this statute says where someone can file a petition. Reynolds is filing a petition jointly to be sure, but it is still filing a petition in a place that the statute does not contemplate. Now, I take Justice Alito's concern about how there are 600 statutes pointed to in one of the amicus briefs. I went back and looked at that brief. It's 600 statutes that use the term adversely affected or aggrieved, not 600 statutes that use similar language to this statute with respect to venue. So a decision about venue, while it could affect other statutes, is not going to be nearly as far-reaching as my opponents have suggested or their amici have suggested. It's going to be limited to statutes that are worded like the statute at issue here. Now, it's true, Justice Gorsuch, to address your question about how they might come up with ways to circumvent whatever it is that we come up with in this case. And we will have responses to that. And that may eventually come back to this Court in a future case. But the only issue that the Court needs to address now is whether multiple parties can sue in a place where only one of them resides. The language of this statute makes it clear that they can't do so. I'd like to end just by noting that we have to be right either on the first issue or the second issue, because if we're wrong on both issues, then this venue provision, for all practical purposes, becomes meaningless. Congress specified two particular places where someone can sue, the Home Circuit and the D.C. Circuit. But the practical consequence of the decision below is that a person can sue anywhere in any circuit, and that can't possibly be right. We ask that the judgment be reversed. Thank you, Counsel. The case is submitted.